UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X

| | | |
|---|---|---|
| JOHN HETTINGER, | : | |
| | : | |
| Plaintiff, | : | CASE NO.: _____ |
| | : | |
| -against- | : | COMPLAINT |
| | : | |
| GCI LIBERTY BROADBAND, INC., JOHN | : | DEMAND FOR JURY TRIAL |
| C. MALONE, GREG B. MAFFEI, RONALD | : | |
| A. DUNCAN, GREGG L. ENGLES, DONNE | : | |
| F. FISHER, RICHARD R. GREEN, and SUE | : | |
| ANN HAMILTON, | : | |
| | : | |
| Defendants. | : | |

------------------------------------- X

Plaintiff John Hettinger ("Plaintiff"), by and through his attorneys, alleges the following

upon information and belief, including investigation of counsel and review of publicly-available

information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal

knowledge:

## NATURE OF THE ACTION

1.      This is an action brought by Plaintiff against GCI Liberty Broadband, Inc. ("GCI"

or the "Company") and members of the Company's board of directors (collectively referred to as

the "Board" or the "Individual Defendants" and, together with GCI, the "Defendants") for their

violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"),

15 U.S.C. §§ 78n(a), 78t(a) respectively, United States Securities and Exchange Commission

("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, and for breaching their fiduciary duty of candor.

Plaintiff's claims arise in connection with the proposed merger between the Company and Liberty

Broadband Corporation ("Liberty Broadband").

2.      On August 6, 2020, GCI entered into an Agreement and Plan Of Merger (the

"Merger Agreement"), by and among Liberty Broadband, Grizzly Merger Sub 1, LLC, a wholly owned subsidiary of Liberty Broadband, and Grizzly Merger Sub 2, Inc., a wholly owned subsidiary of Grizzly Merger Sub 1, LLC.

3.      Pursuant to the Merger Agreement, Grizzly Merger Sub 2, Inc. will merge with and into GCI, with GCI surviving and becoming an indirect wholly owned subsidiary of Liberty Broadband. Immediately following the merger of GCI and Grizzly Merger Sub 2, Inc., GCI, as the surviving corporation of that prior merger, will merge with and into Grizzly Merger Sub 1, LLC (together with the prior merger of GCI and Grizzly Merger Sub 2, Inc., the "merger" or the "Proposed Transaction"), with Grizzly Merger Sub 1, LLC surviving this subsequent merger as a wholly owned subsidiary of Liberty Broadband.

4.      As consideration, under the terms of the Merger Agreement (i) each share of GCI Series A common stock will be converted into 0.580 shares of Liberty Broadband Series C common stock; and (ii) each share of GCI Series B common stock will be converted into 0.580 shares of Liberty Broadband Series B common stock. (the "Merger Consideration").

5.      On October 30, 2020, in order to convince GCI's public common stockholders to vote in favor of the merger, the Board authorized the filing of a materially incomplete and misleading definitive proxy statement (the "Proxy") with the SEC. The Proxy contains material omissions concerning: (i) the financial projections for Liberty Broadband and GCI, (ii) the valuation analyses performed by the Company's financial advisor, Evercore Group L.L.C. ("Evercore"); and (iii) regarding Evercore's compensation.

6.      The shareholder vote is scheduled for December 15, 2020 (the "Shareholder Vote"). It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's stockholders prior to the Shareholder Vote so they can properly

determine whether to vote for or against the Proposed Transaction.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, Rule 14a-9, and Delaware State law.  Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to GCI's public common stockholders sufficiently in advance of the upcoming Shareholder Vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' misconduct.

**JURISDICTION AND VENUE**

8.      This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1331 because the claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.

9.      This Court has jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367.

10.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

11.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. §
78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact
business in this District. Indeed, the Company's financial and legal advisors are headquartered in
this District, and its stock trades on the Nasdaq Global Select Market ("Nasdaq") which is also
headquartered in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir.
2003) (collecting cases).

## PARTIES

12.     Plaintiff is, and has been at all relevant times, the owner of GCI common stock.

13.     Defendant GCI is a Delaware corporation with its principal executive offices
located at 12300 Liberty Broadband Boulevard, Englewood, Colorado 80112. The Company's
common stock trades on the Nasdaq under the ticker symbol "GLIBA."

14.     Defendant John C. Malone is, and has been at all relevant times, the Chief
Executive Officer and Chairman of the Board of GCI.

15.     Defendant Greg B. Maffei is, and has been at all relevant times, a director of GCI.

16.     Defendant Ronald A. Duncan is, and has been at all relevant times, a director of
GCI.

17.     Defendant Gregg L. Engles is, and has been at all relevant times, a director of GCI.

18.     Defendant Donne F. Fisher is, and has been at all relevant times, a director of GCI.

19.     Defendant Richard R. Green is, and has been at all relevant times, a director of GCI.

20.     Defendant Sue Ann Hamilton is, and has been at all relevant times, a director of
GCI.

21.     The defendants identified in paragraphs 14 through 20 are collectively referred to
herein as the "Board" or the "Individual Defendants," and together with GCI, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A.  Background of the Proposed Transaction

22.     GCI operates and owns interests in a broad range of communications businesses. GCI's principal assets consist of its subsidiary GCI Holdings, LLC ("GCI Holdings") and interests in Charter Communications, Inc. and Liberty Broadband. GCI Holdings is Alaska's largest communications provider, providing data, wireless, video, voice and managed services to consumer and business customers throughout Alaska. GCI Holdings has delivered services for nearly 40 years to some of the most remote communities and in some of the most challenging conditions in North America. GCI Liberty's other businesses and assets consist of its subsidiary Evite, Inc. ("Evite") and its interest in LendingTree, Inc. ("LendingTree").

23.     Liberty Broadband's businesses consist of its interest in Charter Communications and its subsidiary Skyhook.

24.     On August 6, 2020, GCI authorized the announcement of the Proposed Transaction. The press release stated in relevant part as follows:

#### Liberty Broadband and GCI Liberty Broadband Announce Proposed Combination

ENGLEWOOD, Colo.--(BUSINESS WIRE)--Liberty Broadband Corporation ("Liberty Broadband") (NASDAQ: LBRDA, LBRDK) and GCI Liberty Broadband, Inc. ("GCI Liberty Broadband") (NASDAQ: GLIBA, GLIBP) announced today that they have entered into a definitive merger agreement under which Liberty Broadband has agreed to acquire GCI Liberty Broadband in a stock-for-stock merger (the "Combination").

"This process was driven by independent special committees of Liberty Broadband and GCI Liberty Broadband, and John Malone and I fully endorse the combination," said Greg Maffei, Liberty Broadband and GCI Liberty Broadband President and CEO. "The transaction is financially attractive and beneficial for both companies."

Liberty Broadband's businesses consist of its interest in Charter Communications, Inc. ("Charter") and its subsidiary Skyhook. Liberty Broadband also announced

today that its Board of Directors increased its repurchase authorization by $1 billion, bringing total authorization to $1.2 billion.

GCI Liberty Broadband's principal assets consist of its subsidiary GCI Holdings, LLC and non-controlling interests in Liberty Broadband, Charter Communications, Inc., and LendingTree, Inc.

Liberty Broadband and GCI Liberty Broadband believe the Combination will provide the following benefits to all shareholders:

- Generate savings on public company and overhead costs
- Simplify administrative and management complexity
- Aim to reduce trading discounts to underlying equities
- Improve flexibility for future strategic combinations

Liberty Broadband believes benefits of the Combination include:

- Issuing Liberty Broadband equity to take advantage of the more discounted GCI Liberty Broadband equity
- Accretive to NAV per share
- Acquiring an attractive incremental cable asset with synergy potential
- Additional operating asset with free cash flow provides potential for incremental share repurchase
- Strengthening trading liquidity in LBRDK

GCI Liberty Broadband believes the Combination will provide the following benefits:

- Tie GCI Liberty Broadband's future to the more strategic Liberty Broadband
- Premium to the trading price
- Elimination of the "double-discount" through the LBRDK stake
- Ongoing participation in attractive Charter
- Elimination of corporate level tax on the LBRDK gain
- More liquid currency
- Larger, stronger balance sheet

Under the terms of the merger agreement:

- Each holder of GLIBA will receive 0.580 of a share of LBRDK
- Each holder of GLIBB will receive 0.580 of a share of LBRDB
- Each holder of GLIBP will receive one share of Liberty Broadband Cumulative Redeemable Preferred Stock (with mirror terms to the current GLIBP)
- Cash to be issued in lieu of fractional shares

At the closing of the Combination:

- Former holders of the GCI Liberty Broadband common stock are expected to own in the aggregate shares of LBRDK and LBRDB representing approximately 30.6% of the total number of outstanding Liberty Broadband common shares
- Former holders of GLIBP will own in the aggregate all outstanding shares of Liberty Broadband Preferred Stock newly issued in the Combination
- Former holders of GCI Liberty Broadband common stock and GLIBP are expected to own, in the aggregate, approximately 16.7% of the voting power of Liberty Broadband

The foregoing percentages are based on approximately 26.5 million shares of LBRDA, approximately 2.5 million shares of LBRDB and approximately 153.0 million shares of LBRDK outstanding as of July 15, 2020 and approximately 101.3 million shares of GLIBA and approximately 4.5 million shares of GLIBB outstanding as of April 30, 2020 and approximately 7.2 million shares of GLIBP outstanding as of March 31, 2020.

The companies expect the Combination to close in the first half of 2021, subject to potential COVID-19 related delays.

The Combination was recommended to the Liberty Broadband Board of Directors for approval by a special committee composed of independent, disinterested directors and advised by independent financial and legal advisors. The Combination was recommended to the GCI Liberty Broadband Board of Directors for approval by a special committee composed of independent, disinterested directors and advised by independent financial and legal advisors.

The closing of the Combination is subject to certain customary conditions, including:

- Adoption of the merger agreement by:
  - Holders of a majority of the aggregate voting power of the GCI Liberty Broadband outstanding stock entitled to vote thereon
  - Holders of a majority of the aggregate voting power of the GCI Liberty Broadband outstanding stock entitled to vote thereon not owned by John C. Malone and certain other persons
  - Holders of a majority of the aggregate voting power of the Liberty Broadband outstanding stock entitled to vote thereon not owned by John C. Malone and certain other persons
- Approval of the Liberty Broadband stock issuance by holders of a majority of the aggregate voting power of the Liberty Broadband outstanding stock present in person or by proxy at the stockholder meeting and entitled to vote thereon
- The receipt of any applicable regulatory approvals

John C. Malone, the Chairman of the Board of Liberty Broadband and GCI Liberty Broadband, and certain related holders, agreed to vote shares beneficially owned by them, representing approximately 48.3% of the aggregate voting power of Liberty Broadband and approximately 27.0% of the aggregate voting power of GCI Liberty Broadband, in favor of the Combination.

In addition, Liberty Broadband entered into an exchange agreement with Mr. Malone pursuant to which he will waive the right to receive LBRDB in the Combination with respect to certain shares of GLIBB beneficially owned by him and will instead receive an equal number of LBRDK so that Mr. Malone's aggregate voting power at Liberty Broadband remains at approximately 49% at the closing of the Combination, which is equal to Mr. Malone's current voting power in Liberty Broadband. Following the closing, Mr. Malone would be able to exchange shares of LBRDK on a one-for-one basis for the waived shares of LBRDB in order to preserve his target voting power of approximately 49% (subject to adjustment for certain transfers by Mr. Malone) following the occurrence of certain voting dilution events and in certain circumstances, Mr. Malone will be required to transfer shares of LBRDB owned by him to Liberty Broadband in exchange for an equal number of shares of LBRDK in order to preserve the target voting power.

Perella Weinberg Partners LP is serving as exclusive financial advisor to the special committee of Liberty Broadband, and Evercore is serving as exclusive financial advisor to the special committee of GCI Liberty Broadband. Debevoise & Plimpton LLP is serving as legal counsel to the special committee of Liberty Broadband, and Morris, Nichols, Arsht & Tunnell LLP is serving as legal counsel to the special committee of GCI Liberty Broadband. Steptoe & Johnson LLP is serving as independent tax counsel to the special committee of GCI Liberty Broadband, and Skadden is serving as special tax counsel to GCI Liberty Broadband. Baker Botts LLP is representing GCI Liberty Broadband in their capacity as regular outside counsel.

25.     The Merger Consideration is unfair to GCI's non-controlling stockholders, and provides an unfair, unique benefit to Defendant Malone. Defendant Malone, together with his repeat business partner, Defendant Maffei, control approximately 35% of GCI's voting power despite owning less than 7% of its economic interests. Combining GCI with Liberty Broadband, another company over which Defendant Malone and Defendant Maffei have control,  will push the public investors stake down to zero while at the same time increasing their voting control of the combined company. Moreover, the Proposed Transaction comes as the result of an unfair

process with a conflicted Special Committee.

26.     Piggybacking off the uncertainty of Pandemic, the Proposed Transaction may inordinately compensate Liberty Broadband stockholders and reward the Individual Defendants, all at the expense of the Company's common stockholders. Therefore, it is imperative that stockholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for stockholders to properly exercise their corporate suffrage rights and in order to cast an informed vote on the Proposed Transaction.

**B.  The Proxy Omits Certain Material Information**

27.     On October 30, 2020, Defendants authorized the filing of a materially incomplete and misleading Proxy with the SEC. The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents or omits material information concerning the companies' financial projections, Evercore's financial analyses, and conflicts concerning Evercore's compensation. This information is necessary for GCI's stockholders to make an informed decision on how to vote their shares, in violation of Sections 14(a) and 20(a) of the Exchange Act, and SEC Rule 14a-9.

28.     *First*, the Proxy omits GCI's projected cash flows, despite those projections being utilized in Evercore's *Discounted Cash Flow Analysis*. The omission of cash flow projections has, on its own, served as the basis for a post-close damages action. For a simple reason, management has meaningful insight into the Company's financial future that the market does not. By example, if the cash flow projections utilized in the *Discounted Cash Flow Analysis* were to show a tremendous decrease from the projections disclosed to stockholders, stockholders would be more apt to vote against the merger, and inversely the same holds true. By choosing to withhold the

Company's cash flow projections, the Board has chosen to blindfold stockholders to fundamental valuation information and instead, left stockholders out in the dark with only market data for guidance. This is not a game of poker where a player must conceal his unexposed cards, the object of a Proxy is to put all one's cards on the table face-up.

29.     *Second,* concerning the omission of cash flow projections for Liberty Broadband, Evite, LendingTree, and Skyhook, these too, must be disclosed. Stockholders are instead being asked to dilute and forego their voting positions, and to accept a new stake in a *pro forma* entity containing Liberty Broadband. Without providing these cash flows, Company stockholders will receive a misleading picture about the projected returns from their current and new holdings in Liberty Broadband.

30.     *Third*, the Proxy misleading states or omits material information regarding the analyses performed by Evercore on GCI Holdings in rendering its fairness opinion.

31.     With respect to the *Selected Public Company Trading Analysis* for GCI Holdings, the Proxy must disclose: (i) the bases for selecting each company observed; (ii) the total enterprise multiple ("TEV") for each of the companies selected; (iii) the expected EBITDA for each of the companies selected; and (iv) all other inputs and assumptions underlying the calculated range of implied enterprise values.

32.     With respect to the *Precedent Transactions Analysis* for GCI Holdings, the Proxy must disclose: (i) the bases for selecting each of the transaction observed; (ii) the total enterprise value for each of the target companies; (iii) the TEV and LTM EBITDA for each of the target companies observed; and (iv) all other inputs and assumptions underlying the calculated range of implied range of enterprise values.

33.     With respect to the *Discounted Cash Flow Analysis* for GCI Holdings, the Proxy

fails to disclose: (i) the cash flow projections from the GCI Forecast; (ii) the assumptions for applying an assumed perpetuity growth rate range of 1.5% to 2.5; (iii) the inputs and assumptions for utilizing a weighted average cost of capital of 6.25% to 7.25%; (iv) the reasons for utilizing the weighted average cost of capital method; (v) the terminal value; (vi) the discount rates and assumptions for utilizing those discount rates; and (vii) all other inputs and assumptions underlying the Proposed Transaction.

34.     Likewise, the Proxy fails to fully disclose **all of** Evercore's financial analyses, including the ones performed on June 17, June 23, and June 30, 2020, among others, which must be disclosed for stockholders to have a fully informed vote.

35.     Fairness opinions are fundamental to the M&A process and is ultimately what stockholders rely upon in their determination to vote for or against a transaction. Unfortunately, fairness opinions are also vulnerable to manipulation, which is why it is of the utmost important that stockholders have analyses available—such as those omitted here—to determine whether those metrics are reasonable, or whether they were unreasonably selected in order to obtain a finding of fairness. In valuing transactions such as these, it becomes all the more critical. As one highly respected professor explained in one of the most thorough law review articles regarding the fundamental flaws of fairness opinions, in a financial analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of

dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78. Therefore, in order for stockholders to determine how to vote they need access to the above information, and the omission of these metrics makes each financial analysis identified inherently misleading.

36.    ***Fourth***, The Proxy Statement notes that "Evercore may, in the discretion of the GCI Special Committee, also receive an additional fee of up to $1 million based on, among other things, the GCI Liberty special committee's satisfaction with the services provided by Evercore and the benefit provided to GCI Liberty stockholders upon completion of the combination." Proxy at 104. However, the Proxy Statement fails to disclose whether Defendants intend to pay Evercore such additional fee. Information that bears on whether an investment bank faces conflicts of interest is material to stockholders when deciding how to vote on a merger. As it is imperative for stockholders to be able to understand what factors might influence the financial advisor's analytical efforts. A financial advisor's own proprietary financial interest in a proposed transaction must be carefully considered in assessing how much credence to give its analysis. For that reason, the benefits of the Merger to the investment banker, beyond its fee, must also be disclosed to stockholders.

37.    In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the Shareholder Vote, Plaintiff will be unable to make

an informed decision concerning whether to vote his shares, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## CAUSES OF ACTION

### COUNT I

**(Against All Defendants for Violation of Section 14(a) of the Exchange Act and Rule 14a-9)**

38.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

39.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any Proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

40.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

41.     The omission of information from a Proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

42.     Defendants have issued the Proxy with the intention of soliciting the Company's common stockholders' support for the Proposed Transaction.  Each of the Individual Defendants

reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding the valuation analyses performed by Evercore in support of its fairness opinion.

43.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's stockholders although they could have done so without extraordinary effort.

44.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Evercore reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analysis provided by Evercore, as well as the fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review Evercore's analyses in connection with their receipt of the fairness opinion, question Evercore as to its derivation of fairness, and be

particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

45.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a Proxy by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

46.     GCI is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

47.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

48.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

49.     The Individual Defendants acted as controlling persons of GCI within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers

and/or directors of GCI, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

50.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

51.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

52.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

53.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

54.     As set forth above, the Individual Defendants had the ability to exercise control

over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

### COUNT III

**(Against the Individual Defendants for Breach of Their
Fiduciary Duty of Candor/Disclosure)**

55.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

56.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

57.     By virtue of their role as directors and/or officers of the Company, the Individual Defendants directly owed Plaintiff a fiduciary duty of candor/disclosure, which required them to disclose fully and fairly all material information within their control when they sought shareholder action, and to ensure that the Proxy did not omit any material information or contain any materially misleading statements.

58.     As alleged herein, the Individual Defendants breached their duty of candor/disclosure by approving and/or causing the materially deficient Proxy to be disseminated to Plaintiff and the Company's other public stockholders.

59.     The misrepresentations and omissions in the Proxy are material, and Plaintiff will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Where a shareholder has been denied one of the most critical rights he or she possesses—the right to a fully informed vote—the harm suffered is an

individual and irreparable harm.

60.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.     Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 24, 2020

**MONTEVERDE & ASSOCIATES PC**

*/s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel:(212) 971-1341
Fax:(212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*